AMERICAN OIL COMPANY *v.* JOHN VALENTI ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued October 12—decision released December 18, 1979

*Victor P. Fasano,* for the appellant (defendant James Valenti).

*Madeleine F. Grossman,* with whom, on the brief, was *Jeremy G. Zimmerman,* for the appellee (plaintiff).

PETERS, J.  This case concerns the liability of a surety on a negotiable promissory note and a simultaneous contract of guaranty.  When the principal debtor, John Valenti, refused to make certain payments alleged to be due to the plaintiff, American Oil Company (hereinafter "Amoco"), the plaintiff brought suit against John Valenti, his wife Dorothy Valenti, and his father James Valenti, the present defendant.  The suit against John Valenti and Dorothy Valenti was nonsuited as the result of the nonproduction by the plaintiff of certain documents ordered pursuant to a motion for disclosure. Although the plaintiff unsuccessfully moved to have the judgment of disciplinary nonsuit set aside, it did not take an appeal from the judgment rendered, and elected instead to pursue its rights against the remaining defendant James Valenti. James Valenti's motion for nonsuit, heard by a different judge of the Superior Court, was denied. After a subsequent full trial before *Naruk, J.,* judgment was rendered against the defendant James Valenti who thereafter took the instant appeal.

This appeal raises two major issues, one substantive and one evidentiary.  The substantive question involves the relationship between the liability of a surety and the discharge of the principal obligor whose indebtedness the surety has agreed to underwrite.  The evidentiary question involves the admissibility of computer print-outs under the business records exception to the hearsay rule.

## I

On the substantive question of the extent of the defendant's liability as surety, the findings of fact of the trial court are not subject to correction.[1] They establish that the plaintiff Amoco, a corporation in the business of selling petroleum products, entered in 1967 into an arrangement with John Valenti whereby John Valenti became a lessee of an Amoco service station and a dealer in Amoco products. As a condition of the lease and dealership, a guaranty was required, and the defendant-appellant James Valenti signed a note and a guaranty. Both the note and the guaranty were co-signed by John Valenti, Dorothy Valenti, and James Valenti. John Valenti alone ran the service station, and Dorothy and James were, from the outset, accommodation parties. In 1970, John Valenti ceased operating the service station and was subsequently dispossessed therefrom. A little more than a year later, in August of 1971, Amoco initiated the present suit to collect amounts alleged to be owing on John Valenti's book account and on his note.

The parties are in agreement about the proper characterization of the defendant's obligations to the plaintiff. On the promissory note, which he signed as co-maker, James Valenti is an accommodation maker, a surety. Despite the fact that his signing as an accommodation was known to the plaintiff, the defendant remains liable "in the capacity [i.e., as maker] in which he has signed." Uni-

---

[1] Assignments of error with regard to the finding on the evidentiary question will be considered infra when that question is addressed on the merits.

form Commercial Code § 3-415 (2); General Statutes § 42a-3-415 (2). As a maker on the note, John Valenti unconditionally engaged "that he will pay the instrument according to its tenor." Uniform Commercial Code § 3-413 (1); General Statutes § 42a-3-413 (1). On the contract of guaranty, James Valenti undertook, as a "primary obligation," to guarantee "absolutely and unconditionally . . . the prompt payment of all sums of money . . . unpaid by the principal debtor [John Valenti]." The contract expressly waived, *inter alia,* "failure upon the part of the Obligee [Amoco] to make demand or use diligence." On both documents, therefore, James Valenti agreed to be a surety, a person who would be primarily liable for payment without regard to any prior demand for payment from John Valenti.

Once these relationships are understood, it is clear that the defendant's claim to substantive immunity cannot easily prevail. The mere fact that a suit against the principal debtor resulted in a nonsuit cannot be a defense to a surety who has agreed to pay regardless of whether and when demand for payment is made upon another. See Peters, A Negotiable Instruments Primer 64-65 (1974). The defendant claims however that the nonsuit established affirmatively that the principal debtor has a basis for discharge that automatically extinguishes the liability of the surety. Relying upon *Eising* v. *Andrews,* 66 Conn. 58, 65, 33 A. 585 (1895), and *Bernd* v. *Lynes,* 71 Conn. 733, 735, 43 A. 189 (1899), the defendant argues that since the plaintiff is now debarred from suing John Valenti, he is equally foreclosed from imposing liability upon John's surety James. Because the surety's

contract is ancillary to that of the debtor, suretyship law has permitted the surety to assert the defenses or the discharge of his debtor unless the very purpose of the suretyship was to shift the risk of this event from the creditor to the surety. Classically, fraud in the procurement is an example of a defense that the surety may assert, while bankruptcy or infancy of the debtor does not discharge the surety. See Simpson, Handbook on the Law of Suretyship §§ 52-62; 10 Williston, Contracts § 1214 (1967). Although § 3-415 (3) of the Uniform Commercial Code, General Statutes § 42a-3-415 (3), gives an accommodation party like James Valenti "the benefit of discharges dependent on his character as such," neither this language nor the relevant accompanying Official Comment is especially enlightening about what sorts of discharges fall within the scope of § 3-415 (3). See Peters, Suretyship under Article 3 of the Uniform Commercial Code, 77 Yale L.J. 833, 861–76 (1968). In the inevitable conflict of perspective between the law of suretyship, which views the engagement of a surety as *strictissimi juris,* and the law of negotiable instruments, which views the engagement of a maker as unconditionally binding, there is considerable room for case-by-case determination of what discharges are "dependent on [the] character" of an accommodation maker. The single most useful guideline that the cases and the commentators suggest is to inquire whether the conduct of the creditor has unreasonably and without authorization materially altered the risk that the surety can properly be understood to have underwritten by virtue of the suretyship commitment. See White & Summers, Handbook of the Law under the Uniform Commercial Code §§ 13-14—13-17 (1972).

That test weighs heavily against automatic discharge of a surety whose liability on note and contract is absolute and primary.

On the facts of this case, the surety's argument for discharge cannot be sustained. The decision of the plaintiff not to pursue remedies against the defendant's co-makers would not, in and of itself, have been a defense. This is implicit in the defendant's liability as maker and explicit in the terms of the contract of guaranty. The decision to allow the disciplinary nonsuit to stand is no different. Such a decision in no way interferes with the defendant's rights to reimbursement from the principal debtor once the defendant has met his suretyship obligation. Uniform Commercial Code § 3-415 (5); General Statutes § 42a-3-415 (5). Since the defendant and the other obligors were *ab initio* sued jointly, the defendant has not been misled or injured by the nonsuit. For similar reasons, the defendant is not discharged by the running of the statute of limitations against the principal debtor during the pendency of this cause of action against the surety. In contradistinction to *Bernd* v. *Lynes,* 71 Conn. 733, 43 A. 189 (1899), upon which the defendant relies heavily, the statute had not yet run when the defendant was first sued. The continuing authority of *Bernd* v. *Lynes* is furthermore doubtful. *Bernd* v. *Lynes* failed to recognize that the defendant's right to recourse for reimbursement after payment triggers the accrual of a new cause of action for indemnification for which the statute of limitations does not begin to run until payment. *Gilbert* v. *Selleck,* 93 Conn. 412, 416, 106 A. 439 (1919). The bar of the statute of limitations in the action between the plaintiff and the principal debtor is therefore not a bar to the action

against this defendant. *McEvoy* v. *Waterbury*, 92 Conn. 664, 666–67, 104 A. 164 (1918). *Gilbert* and *McEvoy* and the enactment of the Uniform Commercial Code all support the conclusion in 10 Williston, Contracts § 1214 (1967) that the running of the statute of limitations against the principal is not a defense to the surety. The trial court was therefore not in error in failing to find that the defendant James Valenti's liability had been extinguished as a matter of law.

## II

The defendant's second claim of error contests the admissibility into evidence of computer printouts summarizing the state of the principal debtor's accounts with the plaintiff. The trial court, over the defendant's timely objections, admitted a number of cumulative monthly computer statements into evidence upon a finding of fact that the plaintiff had complied with the business records exception to the hearsay rule. That exception is now codified in General Statutes § 52-180, The Uniform Business Records as Evidence Act,[2] which provides in relevant part: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of such act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of such business to make such writing or record at the time of such act, transaction, occurrence or event or within a reasonable time there-

[2] This uniform act has now been recodified as Rule 803 (6) of the Uniform Rules of Evidence Act, promulgated in 1974. Cf. Federal Rules of Evidence § 803 (6).

after." The defendant challenges the sufficiency of the evidence to support the trial court's finding. The admissibility of evidence generated by computers is an issue of first impression in this state.

The subsidiary findings of the trial court, corrected as warranted,[3] establish that the proffered summaries were computer print-outs issued by the plaintiff Amoco at monthly intervals to establish a running basis for current accounts between the plaintiff and its dealers. Each set of summaries updated and replaced earlier summaries. The print-outs were issued within a reasonable time after the transactions reflected therein, and the underlying invoices had regularly been sent, without objection, to the principal debtor John Valenti.

These findings adequately support the court's conclusionary finding that the proffered records satisfy two of the three tests required by § 52-180. The evidence definitively shows that it was in the regular course of the plaintiff's business to make these records, and that the records were made when the act or transaction or event occurred, or shortly thereafter. See Tait & LaPlante, Handbook of Connecticut Evidence § 11.14, p. 227 (1976). Despite the defendant's argument to the contrary, a computer print-out qualifies as a "record, whether in the form of an entry in a book or otherwise," within § 52-180. This is the uniform holding of the case law in other jurisdictions; see, e.g., *Transport Indemnity Co.* v. *Seib,* 178 Neb. 253, 132 N.W.2d 871 (1965) and the annotation following at 11 A.L.R.3d 1377 as supplemented; and reflects the revolution in data processing that is part of modern reality.

[3] The finding should have included certain material undisputed facts contained in the defendant's draft finding.

Because computer records are part of ordinary business activities, created for business rather than for litigation purposes, they carry with them the assurance of regularity that is a large element in establishing their trustworthiness. See *Perma Research & Development* v. *Singer Co.*, 542 F.2d 111, 125 (2d Cir. 1976), cert. denied, 429 U.S. 987, 97 S. Ct. 507, 50 L. Ed. 2d 598 (1976) (dissenting opinion).

The trial court also found that the computer records before it were made in the ordinary course of the plaintiff's business, and thus established the third and only remaining test for their admissibility. The court relied upon the testimony of the plaintiff's witness James Nolan, the sales manager who had supervised the John Valenti account, whose knowledge of computer processing was derived from his monthly receipt of relevant computer print-outs and from his working with others in the plaintiff's employ who were directly responsible for credit and computer procedures. Nolan did not himself personally participate in preparing the underlying statements, nor did he himself use a computer. Nolan was the sole witness whom the plaintiff offered to authenticate the computer records. The defendant repeatedly challenged his competency to do so and hence the foundation for the admission of the disputed records.

The issue before us is whether computer records may be found to have been made in the ordinary course of the plaintiff's business upon the testimony of one who used such records and had only an indirect role in their production. Is the extent of the witness' personal knowledge a question that goes to the weight of the evidence only, to be

explored through cross-examination, or is it a condition of admissibility in the first instance? The trial court repeatedly indicated that it subscribed to the former view, that a witness without detailed knowledge of computers could properly testify to the making of these records. In light of the particular facts of this case, we agree.

Business records are an accepted exception to the rule barring hearsay evidence because conformity with the statutory conditions that limit their admissibility is deemed to provide reasonable indicia of reliability. *Hutchinson* v. *Plante,* 175 Conn. 1, 4, 392 A.2d 488 (1978); McCormick, Handbook of the Law of Evidence § 306, p. 720 (2d Ed. 1972). Even when properly admitted, such records carry no presumption of accuracy, their credibility remaining a question for the trier of fact. *State* v. *Ward,* 172 Conn. 163, 170, 374 A.2d 168 (1976). Their threshold reliability is, however, a continued concern, as evidenced by cases such as *Filisko* v. *Bridgeport Hydraulic Co.,* 176 Conn. 33, 38, 404 A.2d 889 (1978); *Mucci* v. *LeMonte,* 157 Conn. 566, 570, 254 A.2d 879 (1969); and *D'Amato* v. *Johnston,* 140 Conn. 54, 59, 97 A.2d 893 (1953) that emphasize that entries in business records must be based either on the personal knowledge of the entrant or on the information of others with personal knowledge who are under a business duty to transmit such information to the entrant.

Business records that are generated by computers present structural questions of reliability that transcend the reliability of the underlying information that is entered into the computer. Computer machinery may make errors because of malfunctioning of the "hardware," the computer's mechan-

ical apparatus. Computers may also, and more frequently, make errors that arise out of defects in the "software," the input procedures, the data base, and the processing program. See Comment, A Reconsideration of the Admissibility of Computer-Generated Evidence, 126 U. Pa. L. Rev. 425, 439–46 (1977); Note, Admitting Computer Printouts into Evidence, 1977 Wash. Univ. L.Q. 59, 78–80 (1977). In view of the complex nature of the operation of computers and general lay unfamiliarity with their operation, courts have been cautioned to take special care "to be certain that the foundation is sufficient to warrant a finding of trustworthiness and that the opposing party has full opportunity to inquire into the process by which information is fed into the computer." McCormick, Handbook of the Law of Evidence, p. 734 (2d Ed. 1972).

The case law in other jurisdictions has uniformly agreed in principle to the admissibility of computer-generated evidence. The cases are however divided on the immediate issue before us, the credentials of the witness who testifies, by way of foundation, to establish admissibility. Although some courts have permitted foundation testimony by general corporate officers; see, e.g., *United States* v. *DeGeorgia,* 420 F.2d 889, 893 n.11 (9th Cir. 1969); *Sierra Life Ins. Co.* v. *First National Life Ins. Co.,* 85 N. Mex. 409, 413, 512 P.2d 1245 (1973); more courts by far have required testimony by a person with some degree of computer expertise, who has sufficient knowledge to be examined and cross-examined about the functioning of the computer. See, e.g., *Perma Research and Development* v. *Singer Co.,* 542 F.2d 111, 115 (2d Cir. 1976); *United States* v. *Russo,* 480 F.2d 1228, 1239–40 (6th Cir. 1973), cert. denied, 414

U.S. 1157, 94 S. Ct. 915, 39 L. Ed. 2d 109 (1974);
*King* v. *State ex rel. Murdock Acceptance Corporation,* 222 So. 2d 393, 396–97 (Miss. 1969); *Transport Indemnity Co.* v. *Seib,* 178 Neb. 253, 257, 132 N.W.2d 871 (1965); *State* v. *Springer,* 283 N.C. 627, 636, 197 S.E.2d 530 (1973); *Railroad Commission* v. *Southern Pacific Co.,* 468 S.W.2d 125, 128 (Tex. Civ. App. 1971). In principle we believe the latter to be the better view.

Trial courts must have considerable latitude in determining the admissibility of evidence in this area as in others. *Doran* v. *Wolk,* 170 Conn. 226, 232, 365 A.2d 1190 (1976). We are not prepared to identify with precision what status in a particular company's hierarchy a witness must have in order to be sufficiently knowledgeable to testify about computer records. Section 52-180 expressly allows business records to be admitted despite the absence of testimony from "the person or persons who made the writing or record, or who [had] personal knowledge of the act, transaction, occurrence or event recorded." This language is helpful in clarifying that it is not necessary to produce as a witness the keypunch operator who actually entered information into the computer or the programmer who designed the processing program. It does not however shed much light on who *is* a proper witness to testify that computer-generated business records have been made in the ordinary course of business. While a witness from the computer department may well be the optimal proponent of such evidence, such a person may not always be available to testify. What is crucial is not the witness' job description but rather his knowledgeability about the basic elements that afford reliability to computer printouts. See *United States* v. *Russo,* supra. The wit-

ness must be a person who is familiar with computerized records not only as a user but also as someone with some working acquaintance with the methods by which such records are made.

Tested by these criteria, James Nolan's competence to testify that computer-generated records were made in the ordinary course of business is an extremely close question. The mere fact that Nolan as sales manager regularly received and reviewed monthly computer print-outs would not suffice. But Nolan was found by the trial court to have had personal knowledge of the Valenti accounts from his involvement as account supervisor, from information he received from his salesmen, and from company records. He had personal experience with record keeping procedures through working with credit people and discussions with terminal computer people. He therefore could testify that these computer records were made in the ordinary course of business. To the extent that the statutory criteria of admissibility of business records are indicia of reliability, it should be noted that in this case there were additional indicia of reliability: the computer print-outs were made for the purpose of running a business and not for litigation; and the print-outs were derived from earlier records regularly mailed to John Valenti and never contested as to accuracy either by him or by James Valenti. The trial court therefore did not err in admitting these computer-generated records into evidence.

There is no error.

In this opinion the other judges concurred.